UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

COMMODITY FUTURES TRADING
COMMISSION,

                     Plaintiff,

v.

DAMIAN CASTILLA, DCAST CAPITAL
INVESTMENTS LLC, and FIVE TRADERS
LLC,

                     Defendants.

Case No.:  1:22-cv-21520

## PLAINTIFF'S MOTION AND MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ENTRY OF DEFAULT JUDGMENT, PERMANENT INJUNCTION, CIVIL MONETARY PENALTIES, AND ANCILLARY STATUTORY AND EQUITABLE RELIEF AGAINST DEFENDENTS DCAST CAPITAL INVESTMENTS LLC AND FIVE TRADERS LLC

COMES NOW, Plaintiff U.S. Commodity Futures Trading Commission ("Commission" or "CFTC"), pursuant to Federal Rule of Civil Procedure 55(b)(2), and moves this Court to enter a default judgment and permanent injunction order against Defendants DCAST Capital Investments LLC ("DCAST") and Five Traders LLC ("Five Traders") (collectively referred to as the "Entity Defendants"), enjoining the Entity Defendants from committing further violations of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1 *et seq.*, and Commission Regulations ("Regulations"), 17 C.F.R. §§ 1 *et seq.* (2021), imposing a civil monetary penalty, and ordering ancillary equitable relief.  As detailed herein, all the Entity Defendants were properly served with the Complaint and Summons, none of the Entity Defendants filed a response to the Complaint, and entries of default have been entered by the Clerk of the Court against each Entity Defendant.  *See* Dkt. Nos. 6, 8 & 10.  Accordingly, the Commission now requests the Court enter default judgment

against all the Entity Defendants.  In further support of this Motion, the Commission submits the following Memorandum of Law, along with the attached declarations and related exhibits.

## MEMORANDUM OF LAW

## I.      INTRODUCTION

On May 17, 2022, Plaintiff Commodity Futures Trading Commission ("Commission" or "CFTC") filed a Complaint charging Defendants Damian Castilla ("Castilla"), DCAST Capital Investments LLC ("DCAST"), and Five Traders LLC ("Five Traders") (collectively "Defendants"), with violating Sections 4b(a)(1)(A)-(C), 4k(2), 4m(1), 4*o*(1)(A) and (B), and 6(c)(2) of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 6b(a)(1)(A)-(C), 6k(2), 6m(1), 6*o*(1)(A), (B), 9(2), and Commission Regulations ("Regulation") 4.20, 4.21, and 4.22, 17 C.F.R. §§ 4.20, 4.21, 4.22 (2021).

On June 9, 2022, the Commission caused the summons and Complaint to be served upon DCAST and Five Traders by personally serving Castilla, the sole director and managing member of each entity, at a residence associated with him in Miami, Florida in accordance with Fed. R. Civ. P. 4(h)(1)(B).  *See* Dkt. Nos. 6 & 8 (containing Affidavits of Process Server).

Defendants DCAST and Five Traders failed to appear or answer the Complaint within the time permitted by Fed. R. Civ. P. 12(a)(1).  Accordingly, the Commission filed motions for entry of a clerk's default against Defendants DCAST and Five Traders on July 8, 2022, the Clerk of this Court entered a default against Defendants DCAST and Five Traders. *See* Dkt. Nos. 9 & 10. On December 6, 2022, the Commission and Defendant Castilla filed a proposed Consent Order for Permanent Injunction, Civil Monetary Penalty and Other Equitable Relief Against Defendant Damian Castilla.

As alleged in the Complaint, and supported by the evidence submitted with this Motion, between at least January 1, 2014 and continuing through May 17, 2022, the date of filing of the Complaint (the "Relevant Period"), DCAST and Five Traders, acting through Castilla, engaged in a fraudulent scheme to solicit and misappropriate money given to them for the purpose of trading commodity futures contracts in commodity pools.  DCAST and Five Traders were unregistered commodity pool operators ("CPOs"), and Castilla was an unregistered associated person ("AP") of both CPOs.  During the Relevant Period, Defendants fraudulently solicited over $3.4 million from over fifty individuals and entities ("pool participants") to trade futures in commodity pools (the "Pools") that did not exist.  In total, Defendants caused pool participants to lose over $2.6 million.

During the Relevant Period, Defendants made various material misrepresentations to solicit pool participants, including that: (1) Defendants earned significant profits on behalf of pool participants by trading futures; (2) the returns Defendants paid to pool participants were generated from futures trading profits; (3) Castilla was an experienced and profitable trader; and (4) pool participants would have their own trading subaccounts with Defendants DCAST or Five Traders.  Defendants' representations were false.  Among other things, Defendants' trading was not profitable, the funds returned to pool participants were Ponzi payments sourced from later pool participants, and no separate trading accounts were ever created.  In fact, Defendants conducted very little trading in futures accounts as promised.  Instead, Defendants misappropriated the vast majority of the funds, issued false account statements that showed profitable trading in nonexistent trading accounts, and used a portion of the funds obtained from pool participants to pay fake profits to earlier pool participants.

In total, Defendants misappropriated approximately $1.8 million of pool participants funds for personal use, including for car payments, home remodeling, lawn services, clothing, restaurants, and other personal expenses—in addition to making over $1.6 million in Ponzi payments to pool participants.  Additionally, for over fifteen pool participants that provided over $700,000 in funds after March 19, 2020, Castilla failed to disclose that he had been charged by the Florida State Attorney's Office, in Miami-Dade County Case No. 13-2020-CF-004700-0001, with fraud and grand theft in connection with his solicitation of certain pool participants.

Finally, Defendants made false statements of material fact to the Commission that Defendants knew or should have known were false or misleading.  Specifically, Defendants submitted incomplete lists of clients in response to a subpoena that Defendants, through counsel, represented was a complete list of all current and former clients since 2012.

Consequently, on May 17, 2022, the Commission filed a Complaint against Defendants alleging violations of Sections 4b(a)(1)(A)-(C) (misrepresentations and false account statements), 4k(2) (failure to register as an associated person of a commodity pool operator), 4m(1) (failure to register as a commodity pool operator), 4o(1)(A) and (B) (fraud by a commodity pool operator and associated person), and 6(c)(2) (making false statements to the Commission) of the Act, 7 U.S.C. §§ 6b(a)(1)(A)-(C), 6k(2), 6m(1), 6o(1)(A), (B), 9(2), and Regulations 4.20 (failure to operate the pools as separate legal entities and commingling the pools' assets), 4.21 (failure to provide pool disclosure documents), and 4.22 (failure to provide periodic account statements), 17 C.F.R. §§ 4.20, 4.21, 4.22 (2021).

## II.     PARTIES

Plaintiff Commodity Futures Trading Commission is an independent federal regulatory agency that is charged by Congress with administering and enforcing the Act and the Regulations. Complaint ¶ 14.[1]

Defendant DCAST Capital Investments LLC is a Florida entity with its last known place of business in Miami, Florida.  DCAST previously claimed an exemption from registration with the Commission as a commodity trading advisor, but withdrew its exemption in April 2015.  It has never been registered with the Commission.  Castilla is the sole owner and manager of DCAST.  Complaint ¶ 16; *See* Exhibit 1 to Mem. In Support of Default Judgment, Robinson Decl. ("Robinson Decl."), ¶¶ 11, 15.

Defendant Five Traders LLC is a Wyoming entity with its principal place of business in Miami, Florida.  It has never been registered with the Commission.  Castilla is the sole owner and manager of Five Traders.  Complaint ¶ 17; Robinson Decl., Exhibit 1 ¶¶ 12, 16.

Defendant Damian Castilla is a resident of Miami, Florida and is the sole owner and sole managing member of DCAST and Five Traders.  Castilla applied for registration with the Commission as a commodity trading advisor in August 2013, but withdrew that application in November 2013.  Complaint ¶ 15; Robinson Decl., Exhibit 1 ¶¶ 9, 14.

## III.     STATEMENT OF FACTS

### A.     Service of the Complaint on the Entity Defendants

On June 9, 2022, the Commission caused the summons and Complaint to be served upon DCAST and Five Traders by personally serving Castilla, the sole director and managing member

---

[1]     The facts set forth in this Motion are based on the Complaint as well as the Declaration of Elsie Robinson, an investigator for the Commission.

of each entity, at a residence associated with him in Miami, Florida in accordance with Fed. R.

Civ. P. 4(h)(1)(B).  *See* Dkt. Nos. 6 & 8 (containing Affidavits of Process Server).

Defendants DCAST and Five Traders failed to appear or answer the Complaint within the

time permitted by Fed. R. Civ. P. 12(a)(1).  Accordingly, the Commission filed motions for entry

of a clerk's default against Defendants DCAST and Five Traders on July 8, 2022, the Clerk of

this Court entered a default against Defendants DCAST and Five Traders. *See* Dkt. Nos. 9 & 10.

On December 6, 2022, the Commission and Defendant Castilla filed a proposed Consent Order

for Permanent Injunction, Civil Monetary Penalty and Other Equitable Relief Against Defendant

Damian Castilla, which the Court entered the same day.  *See* Dkt. No. 20.

**B.       Factual Allegations of the Complaint Should Be Taken as True**

Because Defendants have not filed any responsive pleadings, the well-pleaded facts in the

Complaint should be taken as true for purposes of this Motion. *See Buchanan v. Bowman*, 820

F.2d 359, 361 (11th Cir. 1987).

**C.       Defendants Fraudulently Solicited Pool Participants for the Pools.**

During the Relevant Period, DCAST and Five Traders, acting through Castilla, engaged

in a fraudulent scheme to solicit and misappropriate money given to them for the purpose of

trading commodity futures contracts ("futures") in commodity pools.  DCAST and Five Traders

were unregistered CPOs, and Castilla was an unregistered AP of both CPOs.  During the

Relevant Period, Defendants fraudulently solicited over $3.4 million from over fifty pool

participants to trade futures in the Pools that did not exist.  Complaint ¶ 1; Robinson Decl.,

Exhibit 1 ¶ 34.

During the Relevant Period, Defendants made material misrepresentations and omissions

to pool participants and prospective pool participants about the Pools via telephone, in-person,

video-conferencing, and electronic communications.  Complaint ¶ 18; Robinson Decl., Exhibit 1 ¶¶ 18-23.

Defendants misrepresented a long history of professional trading—claiming, at times, that Castilla had nearly twenty years of successful professional trading experience, over five years of futures trading experience, and that trading futures had become Castilla's full-time job. In reality, Defendants engaged in very little futures trading and the little trading Defendants engaged in was not profitable.  Complaint ¶ 19; Robinson Decl., Exhibit 1 ¶ 19.

Defendants claimed that pool participants would have separate subaccounts connected to a master trading account that would automatically allocate trades that Defendants placed among Defendants accounts and the accounts of other pool participants.  In reality, Defendants never established any subaccounts for any pool participants; rather Defendants provided pool participants with fake account statements showing fictitious trades and fictitious account balances that represented pool participants' individualized shares of Defendants' trading activity. Complaint ¶ 20; Robinson Decl., Exhibit 1 ¶¶ 18-23, 25.

Once Defendants obtained money from pool participants, Defendants continued to misrepresent their futures trading as profitable by providing pool participants with fake trading account statements that showed regular and consistent profits in purported subaccounts. Defendants regularly used the false trading history reflected in these fake subaccount statements to solicit additional funds from pool participants as well as to solicit new pool participants. Complaint ¶ 21; Robinson Decl., Exhibit 1 ¶¶ 19-23, 29-32.

Defendants often solicited friends and family of earlier pool participants that received fake account statements.  For example, Defendants regularly claimed during oral solicitations that they typically earned profits between eight and ten percent per month for other pool

participants.  *See* Robinson Decl., Exhibit 1 ¶ 19.  The claimed returns were often consistent with

the fake account statements that Defendants provided to pool participants. Complaint ¶ 22;

Robinson Decl., Exhibit 1 ¶ 19

Additionally, Defendants made Ponzi payments to earlier pool participants,

misrepresenting that the funds being returned were from profitable trading in futures accounts.

Defendants used these Ponzi payments to further solicit friends and family members of pool

participants.  For example, during solicitations of new pool participants, Defendants pointed to

the Ponzi payments as proof that Defendants ran legitimate, profitable commodity pools.  In one

instance, Defendants made Ponzi payments of over $40,000 between July and October 2020 to

Participant A.  Shortly thereafter, Defendants obtained $200,000 from two pool participants that

were acquaintances of Participant A.  Within three weeks of receiving this $200,000

contribution, Defendants made additional Ponzi payments of over $150,000 to other pool

participants.  Defendants' bank records show that on many occasions, Defendants would often

dole out recently-received pool participant contributions to earlier pool participants within days

of receipt.   Complaint ¶ 23; Robinson Decl., Exhibit 1 ¶¶ 39-42.

The profits claimed were fake, and like all Ponzi schemes, Defendants became unable to

repay all pool participants that requested redemptions.  Defendants then resorted to even more

false claims to pool participants who requested funds.  In a number of instances, Defendants

claimed that the money was available, but that Defendants' bank accounts had been frozen by

various government agencies.  To some pool participants, Defendants claimed that the Office of

Foreign Assets Control had frozen Defendants' bank accounts due to issues with the funding

source of another pool participant.  To other pool participants, Defendants claimed that the

Commission froze Defendants' bank accounts during an investigation that Defendants were

trying to resolve.  Defendants' bank accounts were never frozen by a government agency; Defendants simply did not have the funds available to repay pool participants.  Complaint ¶ 24; Robinson Decl., Exhibit 1 ¶¶ 18, 20-21.

**D.    Defendants Misappropriated the Vast Majority of Pool Funds for Personal Expenses and to Make Ponzi Payments.**

Of the over $3.4 million that Defendants received from pool participants, Defendants paid over $1.6 million in Ponzi payments to pool participants, claiming that the payments were the result of profitable trading.  Complaint ¶ 25; Robinson Decl., Exhibit 1 ¶¶ 34-35.

Defendants misappropriated approximately $1.8 million for personal expenses. Defendants regularly used corporate bank accounts for Castilla's personal expenses, which included car payments, home remodeling, lawn services, clothing, restaurants, and other withdrawals to Castilla's personal bank accounts.  Complaint ¶ 26; Robinson Decl., Exhibit 1 ¶ 38.

Defendants deposited only a small portion of pool participants' funds for their intended purpose of trading futures—only $105,000 of the over $3.4 million received.  Yet Defendants ultimately withdrew over $50,000 from trading accounts for personal expenses and to make Ponzi payments.   Complaint ¶ 27; Robinson Decl., Exhibit 1 ¶¶ 26-27.

The small amount of futures trading that Defendants engaged in was not profitable. Complaint ¶ 28; Robinson Decl., Exhibit 1 ¶ 26.

**E.    Defendants Provided False Account Statements Misrepresenting the Value of Client Accounts.**

Defendants regularly provided pool participants with account statements that purportedly showed account values and trading activity for each pool participant's subaccount.  Complaint ¶ 29; Robinson Decl., Exhibit 1 ¶¶ 18-23.

The account statements that Defendants provided showed regular and consistent growth in the value of the purported subaccounts for each pool participant.  For example, in at least one instance, Defendants issued false account statements that, over time, showed consistent profits for an account showing growth from $30,000 to over $5 million.  Robinson Decl., Exhibit 1 ¶ 18.

No accounts existed for any pool participants.  Defendants never created subaccounts for pool participants and very little of pool participants' funds were ever used for trading futures. Complaint ¶ 31; Robinson Decl., Exhibit 1 ¶ 25.

During the Relevant Period, Defendants operated only three commodity interest trading accounts—two in the name of DCAST and one in the name of Five Traders.  Despite receiving over $3.4 million from pool participants for the purpose of trading commodity interests, Defendants deposited a mere $105,000 to their trading accounts.  Defendants lost about $50,000 in trading, and ultimately withdrew over $50,000 from the trading accounts—using the withdrawn funds for personal use or for Ponzi payments to pool participants. Complaint ¶ 32; Robinson Decl., Exhibit 1 ¶¶ 26, 34.

**F.    Defendants' Misappropriation, Misrepresentations, and Omissions Were Intentional or Reckless and Operated as a Fraud on Pool Participants.**

Defendants intentionally or recklessly made material misrepresentations.  Each solicitation of a pool participant was done with the intended purpose to obtain more funds for personal use or to make Ponzi payments to placate earlier pool participants.  Complaint ¶ 33.

Defendants knew that their misrepresentations to pool participants were false and that the Pools did not exist.  Complaint ¶ 34.  Defendants never intended to trade pool participants' funds.  Complaint ¶ 35.  This is evident from Defendants' failure to fund trading accounts with amounts even close to the amounts solicited, and Defendants' failure to create subaccounts as promised.  *See* Robinson Decl., Exhibit 1 ¶¶ 25-27.  Less than four percent of pool participants'

funds were deposited to futures trading accounts.  Complaint ¶ 36; Robinson Decl., Exhibit 1 ¶¶ 25-26.  Yet, Defendants issued false account statements to pool participants showing significant growth in pool participants' subaccounts that never existed.  Complaint ¶ 37; Robinson Decl., Exhibit 1 ¶¶ 19-23, 44.

On March 19, 2020, the Florida State Attorney's Office charged Castilla, in Miami-Dade County Case No. 13-2020-CF-004700-0001, with fraud and grand theft in connection with his fraudulent investment scheme.  In communications with pool participants after being charged, Defendants misrepresented that the account values in the statements Defendants provided were accurate and that Defendants had the funds to repay participants, providing various excuses to different pool participants.  Complaint ¶ 38; Robinson Decl., Exhibit 1 ¶¶ 10, 18-23.

After Castilla was charged criminally, Defendants continued soliciting new pool participants to keep the fraudulent scheme alive, using new funds to continue making Ponzi payments.  Complaint ¶ 39; *see also* Robinson Decl., Exhibit 1 ¶ 19 (identifying Pool Participant B who met and provided funds to Defendants after March 2020).

In total, Defendants solicited over $700,000 from pool participants after Castilla was charged by the Florida State Attorney's Office.  Defendants used these funds for personal expenses and for Ponzi payments.  Complaint ¶ 40.

**G.     Defendants Failed to Operate the Pools as Separate Legal Entities or Receive Pool Funds in the Pools' Names.**

Defendants did not operate the Pools as separate legal entities.  Defendants never created separate legal entities to receive contributions from pool participants.  Although Defendants solicited money on behalf of the Pools, Defendants failed to open bank or futures trading accounts for the Pools.  Rather, Defendants received pool funds in the name of DCAST or Five Traders, the CPOs, before the funds were then misappropriated for Castilla's personal use,

11

misappropriated to make Ponzi payments, or transferred to Castilla's personal bank account. Complaint ¶ 41; *See* Robinson Decl., Exhibit 1 ¶ 8. (identifying bank accounts opened in the name of the CPOs rather than in the name of any Pools) & ¶ 38 (describing transfers from the Entity Defendants' accounts to Castilla's personal accounts).  By transferring pool funds to Castilla's personal bank accounts, Defendants also commingled pool funds with non-pool funds. Complaint ¶ 42; Robinson Decl., Exhibit 1 ¶ 38.

Defendants did not even treat the CPOs as separate entities, but instead commingled funds between DCAST and Five Traders treating both entities as interchangeable.  For example, in some instances, Castilla used funds received by Five Traders to make Ponzi payments to pool participants that had previously provided funds to DCAST.  Complaint ¶ 43; Robinson Decl., Exhibit 1 ¶¶ 38-42.

**H.      Castilla, DCAST, and Five Traders Failed to Register with the Commission.**

During the Relevant Period, Defendants DCAST and Five Traders acted as CPOs in that they engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and they solicited, accepted, or received funds, securities, property, or capital contributions for the purpose of trading in commodity interests.  Complaint ¶ 44; Robinson Decl., Exhibit 1 ¶¶ 18-23.  Defendants DCAST and Five Traders used emails, wire transfers, internet video messaging, text messaging, and other means or instrumentalities of interstate commerce to solicit, accept, and receive pool participants' funds for the purpose of trading futures.  Complaint ¶ 45; Robinson Decl., Exhibit 1 ¶¶ 19-23.  During the Relevant Period, Defendants DCAST and Five Traders were never registered as CPOs and were not exempt or excluded from registration as CPOs.  Complaint ¶ 46; Robinson Decl., Exhibit 1 ¶¶ 15-16.  During the Relevant Period, Defendant Castilla was associated with DCAST and Five Traders as a partner, officer, employee, consultant, or agent in a capacity that involved the

solicitation of funds, securities, or property for a participation in a commodity pool.  Complaint ¶ 47; Robinson Decl., Exhibit 1 ¶¶ 19-23.  Finally, during the Relevant Period, Defendant Castilla was never registered as an AP of DCAST or Five Traders.  Complaint ¶ 48; Robinson Decl., Exhibit 1 ¶ 14.

**I.      Defendants Failed to Provide Pool Disclosures and Other Relevant Documents.**

DCAST and Five Traders, while acting as the CPOs of the Pools, failed to provide pool disclosure documents and other documents required by Regulations 4.21 and 4.22, 17 C.F.R. §§ 4.21, 4.22 (2021), including but not limited to required cautionary statements, risk disclosures, fees and expenses incurred by the Pools, past performance disclosures, a statement that the CPO is required to provide to all pool participants with monthly or quarterly account statements, and an annual report containing financial statements certified by an independent public accountant. Complaint ¶ 49; Robinson Decl., Exhibit 1 ¶ 43.

**J.      Defendants Made False Statements of Material Fact to the Commission.**

On June 21, 2021, the Commission's Division of Enforcement issued a subpoena to Defendants requiring, among other things, that Defendants produce "[d]ocuments sufficient to show the names, addresses, phone numbers, e-mail address, and any other contact information of all current and former customers or clients" of Defendants since 2012.  On August 27, 2021, after retaining counsel, Defendants produced a document that included a list identifying five clients.  Complaint ¶ 50; Robinson Decl., Exhibit 1 ¶¶ 45-47.

On August 31, 2021, Defendants, through counsel, confirmed that Defendants had completed their response to the subpoena's request for information concerning current or former customers or clients.  Complaint ¶ 51; Robinson Decl., Exhibit 1 ¶ 48.

Defendants response identifying only five customers or clients was a false statement of material fact, because Defendants had at least 50 clients during the Relevant Period.  Complaint ¶ 52; Robinson Decl., Exhibit 1¶ 34.

On September 28, 2021, Defendants submitted a supplemental list identifying an additional seven customers or clients.  This list, containing fourteen customers or clients, was also a false statement of material fact.   Complaint ¶ 53; Robinson Decl., Exhibit 1 ¶ 49.

Defendants knew or reasonably should have known that their responses to the subpoena were false or misleading.  In particular, Defendants failed to disclose over forty clients that provided, collectively, almost $2 million.  Defendants communicated with at least one undisclosed client as recently as October 2021 concerning repayment of funds—with Defendants making false statements to the pool participant that funds were available in trading accounts or bank accounts but that Defendants were having temporary delays in accessing those funds. Complaint ¶ 54; *see also* Robinson Decl., Exhibit 1 ¶ 23.

## IV.    LEGAL ARGUMENT

### A.    Default Judgment Is Warranted Against All Defendants.

When a party against whom a default judgment is sought has failed to plead or otherwise assert a defense, and that fact has been documented, the clerk shall enter the party's default.  Fed. R. Civ. P. 55(a).  The party seeking the default shall then apply to the court for a default judgment.  Fed. R. Civ. P. 55(b).  Judgment by default may be entered by a district court against a defendant upon the failure of that defendant to plead or otherwise defend. Fed. R. Civ. P. 55(b); *CFTC v. FX Prof'l Int'l Solutions, Inc.*, No. 1:10-CV-22311-PCH, 2010 WL 5541050, at *4 (S.D. Fla. Nov. 29, 2010); *Vaccaro v. Custom Sounds, Inc.*, No. 3:08-CV-776-J-32JRK, 2009 WL 4015569, at *1 (M.D. Fla. Nov. 19, 2009).  The grant or denial of a motion for default judgment lies within a district court's sound discretion.  *Hamm v. DeKalb Cty.*, 774 F.2d 1567,

1576 (11th Cir. 1985).  Where a party fails to respond, after notice, the court is justified in entering a judgment against the defaulting party. *Natures Way Marine, LLC v. N. Am. Materials, Inc.*, No. Civ. A. 08-0005-WS-B, 2008 WL 801702, at *2 (S.D. Ala. 2008).

Further, if a district court determines that a defendant is in default, then well-pleaded factual allegations of the complaint, except those relating to unspecified damages, will be taken as true and liability is established by the entry of a default.  *Sampson v. Brewer, Michaels & Kane, LLC*, No. 609-CV-2114-ORL-31DA, 2010 WL 2432084, at *1 (M.D. Fla. May 26, 2010) (citing *Buchanan v. Bowman*, 820 F.2d 359, 361 (11th Cir. 1987)); *see also* Fed. R. Civ. P. 8(b)(6) (effect of failure to deny an allegation).  Moreover, "[i]t is a familiar practice and an exercise of judicial power for a court upon default, by taking evidence when necessary or by computation from facts of record, to fix the amount which the plaintiff is lawfully entitled to recover and to give judgment accordingly."  *Pope v. United States*, 323 U.S. 1, 12 (1944).

Here, the Entity Defendants failed to respond to the Complaint after notice, and have not attempted to dispute or defend against the allegations in the Complaint.  As such, the well-pleaded facts of the Complaint, further supported by the declaration submitted by the Commission in support of this Motion, should be taken as true and default judgment should be entered against all the Entity Defendants.

**B.     Jurisdiction and Venue**

This Court possesses jurisdiction over this action pursuant to 28 U.S.C. § 1331 (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (providing that U.S. district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), provides that the Commission may bring actions for injunctive relief or to enforce compliance with the Act or any rule, regulation, or order thereunder in the proper district court of the United

States whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

Venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e), because Defendant Castilla resides in this jurisdiction, and Defendant DCAST was incorporated in this jurisdiction, and the acts and practices in violation of the Act occurred within this District.

**C.    Defendants Fraudulently Solicited, Misappropriated Funds, and Issued False Account Statements in Violation of Section 4b(a)(1)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(1)(A)-(C).**

By misrepresenting and omitting material facts, including Castilla's pending criminal charges, misappropriating pool participant funds, and providing false account statements that misrepresented the Pools' profitability and the value of pool participants' interests in the Pools, Defendants violated Section 4b(a)(1)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(1)(A)-(C).

Section 4b(a)(1)(A)-(C) of the Act prohibits any person or entity from cheating, defrauding, or deceiving another person, and making false reports or statements in connection with commodity futures on or subject to the rules of a designated contract market.  To establish a violation of theses sections, the Commission must show that the Defendants made: (1) a false or misleading representation or deceptive omission; (2) with scienter; (3) that was material.  *CFTC v. R.J. Fitzgerald & Co., Inc.*, 310 F.3d 1321, 1328-29 (11th Cir. 2002).  "By its terms, Section 4b is not restricted in its application to instances of fraud or deceit 'in' orders to make or the making of contracts.  Rather, Section 4[b] encompasses conduct 'in or in connection with' futures transactions.  The plain meaning of such broad language cannot be ignored." *Hirk v. Agri-Research Council, Inc.*, 561 F.2d 96, 103-04 (7th Cir. 1977).  "Whether a misrepresentation has been made depends on the 'overall message' and the 'common understanding' of the information conveyed." *R.J. Fitzgerald*, 310 F.3d at 1328 (citing *Hammond v. Smith Barney*

*Harris Upham & Co.*, CFTC No. 86-R131, 1990 WL 282810 (CFTC Mar. 1, 1990)).

Scienter requires proof that Defendants committed the alleged wrongful acts intentionally or with reckless disregard for their duties under the Act.  *See CFTC v. Allied Markets LLC*, 371 F. Supp. 3d 1035, 1049 (M.D. Fla. 2019); *see also Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (holding that recklessness satisfies scienter requirement where misrepresentations and omissions "present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it"); *CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 774 (9th Cir. 1995); *Drexel Burnham Lambert Inc. v. CFTC*, 850 F.2d 742, 748 (D.C. Cir. 1988) (holding that recklessness is sufficient to satisfy scienter requirement).  The scienter element is established when an individual's acts are performed "with knowledge of their nature and character." *Wasnick v. Refco, Inc.*, 911 F.2d 345, 348 (9th Cir. 1990) (internal quotation marks omitted).  The Commission must demonstrate only that a defendant's actions were "intentional as opposed to accidental." *Lawrence v. CFTC*, 759 F.2d 767, 773 (9th Cir. 1985).  Conduct involving "highly unreasonable omissions or misrepresentations . . . that present a danger of misleading [retail customers] which is either known to the Defendant or so obvious that [the] Defendant must have been aware of it" have been found to meet the scienter requirement.  *CFTC v. Hunter Wise Commodities, LLC*, 21 F. Supp. 3d 1317, 1339 (S.D. Fla. 2014) (citing *R.J. Fitzgerald*, 310 F.3d at 1328).

A statement is material if "a reasonable investor would consider it important in deciding whether to make an investment." *R.J. Fitzgerald*, 310 F.3d at 1328; *see also CFTC v. Commonwealth Fin. Group, Inc.*, 874 F. Supp. 1345, 1353-54 (S.D. Fla. 1994) (noting that "past success and experience are material factors which a reasonable investor would consider when deciding to invest"); *CFTC v. Rosenberg*, 85 F. Supp. 2d 424, 447 (D.N.J. 2000).  Any fact that

enables customers to assess independently the risk inherent in their investment and the likelihood of profit is a material fact. *In re Commodities Int'l Corp.*, CFC. No. 83-42, 1997 WL 11543, at *8-9 (CFTC Jan. 14, 1997) (finding that misrepresentations and omissions to customers were material and fraudulent because customers could not properly evaluate their circumstances with regard to risk of loss and opportunity for profit); *see also SEC v. TLC Invs. & Trade Co.*, 179 F. Supp. 2d 1149, 1153 (C.D. Cal. 2001) (granting summary judgment in favor of the SEC where defendant, among other things, failed to disclose prior tax fraud conviction).  Moreover, "'material misrepresentations about the nature of the organization handling [an] account, the people [dealt] with, and the type of trading [the] funds were used for' would be sufficient to state a cause of action pursuant to the CEA." *Saxe v. E.F. Hutton & Co., Inc.*, 789 F.2d 105, 110 (2d Cir. 1986) (citing *Psimenos v. E.F. Hutton & Co. Inc.*, 789 F.2d 1041, 1043-44, n.5 (2d Cir. 1983)); *see also CFTC v. Wall Street Underground*, 281 F. Supp. 2d 1260, 1270 (D. Kan. 2003) (finding that failure to disclose defendant's fraud conviction, which involved misappropriation of investor funds, was an omission of material fact in violation of anti-fraud provision of the Act).

Finally, fraud by misappropriation of customer funds constitutes "willful and blatant" fraud.  *See*, *e.g.*, *Allied Markets LLC*, 371 F. Supp. 3d at 1049 (citing *CFTC v. Noble Wealth Data Info. Servs., Inc.*, 90 F. Supp. 2d 676, 687 (D. Md. 2000), *aff'd in part, rev'd in part sub nom. CFTC v. Baragosh*, 278 F.3d 319 (4th Cir. 2002)); *see also In re Slusser*, CFTC No. 94-14, 1999 WL 507574, at *12 (CFTC July 19, 1999) (respondents violated Section 4b of the Act by surreptitiously retaining money in their own bank accounts that should have been traded on behalf of investors), *aff'd in relevant part sub nom. Slusser v. CFTC*, 210 F.3d 783 (7th Cir. 2000); *CFTC v. Morse*, 762 F.2d 60, 62 (8th Cir. 1985) (holding defendant's personal use of customer funds violated Section 4b of the Act).

The Defendants' misrepresentations about their prior successful trading results, issuance of false account statements, misappropriation of funds, and failure to disclose pending criminal charges against Castilla related to their operation of the Pools were material and done willfully. Defendants' misrepresentations were material because a reasonable individual would consider it important in the investment decision to know Defendants' real trading history, lack of substantial trading in futures accounts, the true value of trading accounts (that did not exist), and Castilla's pending fraud charges related to his dealings with other pool participants.  Furthermore, issuing false account statements to pool participants that showed consistent and regular profits were material misrepresentations to pool participants, which induced many pool participants to increase their investments in the Pools or refer friends and family members to Defendants. Consequently, Defendants' misrepresentations constitute violations of Section 4b(a)(1)(A)-(C) of the Act.

**D.     Defendants Committed Fraud by Commodity Pool Operators and Their Associated Person in Violation of Section 4o(1)(A) and (B) of the Act, 7 U.S.C. § 6o(1)(A), (B).**

**1.     DCAST and Five Traders Are Commodity Pool Operators.**

A CPO is defined by Section 1a(11)(A) of the Act, 7 U.S.C. § 1a(11)(A), as any person engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests.  DCAST and Five Traders operated as CPOs in that they engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, and in connection therewith, solicited, accepted, or received funds, securities, or property from others for the purpose of trading futures.

### 2.      Castilla Acted as an Associated Person of Both CPOs.

An associated person of a CPO is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2021), in relevant part, as any natural person associated with a CPO "as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves (i) the solicitation of funds, securities, or property for participation in a commodity pool or (ii) the supervision of any person or persons so engaged[.]" Castilla acted as an AP of both DCAST and Five Traders because he was a partner, officer, employee or agent of both entities and solicited and accepted funds, securities, or property from pool participants for participation in the commodity pools.

### 3.      Defendants Violated Section 4*o*(1)(A) and (B) of the Act.

Section 4*o*(1)(A) and (B) of the Act, 7 U.S.C. § 6*o*(1)(A), (B), is a "parallel" statute to Section 4b of the Act in that the same conduct that violates Section 4b of the Act can violate Section 4*o*(1)(A) and (B) of the Act.  "The requirements for a fraud claim under § 4*o* are basically the same as for a fraud claim under § 4b."  *Allied Markets LLC*, 371 F. Supp. 3d at 1050-51 (quoting *First Nat'l Monetary Corp. v. Weinberger*, 819 F.2d 1334, 1340 (6th Cir. 1987); *Stolter & Co. v. CFTC*, 855 F.2d 1288, 1290-91 (7th Cir. 1988*); CFTC ex rel. Kelly v. Skorupskas*, 605 F. Supp. 923, 932-33 (E.D. Mich. 1985).  However, Section 4*o*(1)(A) and (B) of the Act differs from Section 4b of the Act in at least three material respects.  First, Section 4*o*(1)(A) and (B) of the Act requires "use of the mails or any means or instrumentality of interstate commerce."  Second, the provision is concerned with fraud and misrepresentations only by CPOs, CTAs, and their associated persons.  Third, courts construing the provision have held that it is not necessary to prove scienter to establish a violation of Section 4*o*(1)(B) of the Act.  *See Messer v. E.F. Hutton & Co.*, 847 F.2d 673, 678-79 (11th Cir. 1988); *see also In re Kolter*, CFTC No. 93-19, 1994 WL 621595, at *7 (CFTC Nov. 8, 1994).

Many of the misrepresentations and omissions of fact that Castilla made, individually and on behalf of DCAST and Five Traders, were made through use of the email, text messages, video conferencing services over the internet, or other means or instrumentalities of interstate commerce.  Defendants accepted funds and issued Ponzi payments by wire transfers, another instrumentality of interstate commerce.  Also, the fraud was carried out by CPOs and their associated person.  Finally, even though scienter is not required under Section 4$o$(1)(B), Defendants acted with scienter as described above, in violation of Section 4$o$(1)(A).

**E.     DCAST and Five Traders Failed to Register as a Commodity Pool Operator in Violation of Section 4m(1) of the Act, 7 U.S.C. §6m(1).**

Section 4m(1) of the Act, 7 U.S.C. § 6m(1), provides that it is unlawful for any CPO, unless registered under the Act, to make use of the mails or any means or instrumentality of interstate commerce in connection with its CPO business.  As discussed above, DCAST and Five Traders acted as CPOs during the relevant period by engaging in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, and in connection therewith, solicited, accepted, or received funds, securities, or property from others for the purpose of trading futures.  Both entities made use of instrumentalities of interstate commerce in connection with their CPO business.  They used email, text messages, video conferencing services over the internet, and wire transfers, among other means or instrumentalities of interstate commerce. DCAST and Five Traders have never been registered with the Commission and they are not otherwise exempt or excluded from registration.  As a result, they violated Section 4m(1) of the Act.

**F.     Castilla Failed to Register as an Associated Person of Commodity Pool Operators in Violation of Sections 4k(2) of the Act, 7 U.S.C. § 6k(2).**

Section 4(k)(2) of the Act, 7 U.S.C. § 6k(2), makes it unlawful for a person to be associated with a CPO as a partner, officer, employee, consultant, or agent, or a person

occupying a similar status or performing similar functions, in any capacity which involves the solicitation of funds, securities, or property for a participation in a commodity pool.  It is also "unlawful for any commodity pool operator to permit [an unregistered AP] to become or remain associated with the [CPO] in such capacity if the [CPO] knew or should have known that such person was not so registered[.]" As the sole owner and managing director of DCAST and Five Traders, Castilla was a partner, officer, employee, consultant, or agent of DCAST and Five Traders.  Castilla acted as an AP of both entities by soliciting funds for participation in a commodity pool.  Castilla has never been registered with the Commission as an AP of a CPO. Accordingly, and as explained below, Defendants are liable for Castilla's violations of Section 4(k)(2) of the Act.

### G.   Defendants Failed to Operate a Pool as a Separate Entity, Failed to Accept Funds in the Name of the CPO, and Commingled Pool Property in Violation of Regulation 4.20, 17 C.F.R. § 4.20 (2021).

Regulation 4.20(a), 17 C.F.R. § 4.20(a) (2021), requires a CPO to operate its commodity pool as a legal entity separate from that of the CPO.  Regulation 4.20(b) requires that all funds, securities and other property received by a CPO from a prospective or existing pool participant for purchase of an interest or as an assessment must be received in the commodity pool's name. Regulation 4.20(c) prohibits a CPO from commingling the property of any pool it operates with the property of any other person.

Here, Defendants violated Regulation 4.20(a)-(c) because they:  (1) failed to operate the Pools as a separate legal entity; (2) accepted funds from participants in accounts in the name of Castilla, DCAST, and Five Traders, rather than in the name of the Pools; (3) transferred pool participants' funds to Castilla's personal accounts, where those funds were commingled with funds belonging to others; and (4) operated trading accounts in the name of DCAST and Five Traders that were funded with pool participants' money.  Defendants did not follow any

corporate formalities; they did not even create separate entities for the Pools.  Defendants even used Five Traders to make Ponzi payments to pool participants that had provided funds to DCAST.  In other words, Defendants did not even treat the CPOs as separate entities through their commingling of funds in the accounts of the CPOs.

**H.      Defendants Failed to Provide Pool Disclosures and Other Required Documents in Violation of Regulations 4.21 and 4.22, 17 C.F.R. §§ 4.21, 4.22 (2021).**

Regulation 4.21(a)(1), 17 C.F.R. § 4.21(a)(1) (2021), in relevant part, provides that:

[E]ach [CPO] registered or required to be registered under the Act must deliver or cause to be delivered to a prospective participant in a pool that it operates or intends to operate a Disclosure Document for the pool prepared in accordance with §§ 4.24 and 4.25 by no later than the time it delivers to the prospective participant a subscription agreement for the pool . . . .

Regulation 4.22(a), 17 C.F.R. § 4.22(a) (2021), also requires, in relevant part, that CPOs (registered or required to be registered) provide periodic account statements to investors— presented and computed in accordance with generally accepted accounting principles— itemizing, among other things, the total amount of realized net gain or loss on commodity interest positions liquidated during the reporting period, the total amount of unrealized net gain or loss on commodity interest positions during the reporting period, and the total amount of net gain or loss from all other transactions in which the pool engaged during the reporting period. Regulation 4.22(c), 17 C.F.R. § 4.22(c) (2021), in relevant part, requires that CPOs distribute annual reports to investors and file the annual report with the National Futures Association.

There is no evidence that Defendants provided a disclosure document containing the disclosures required by Regulations 4.24 and 4.25, 17 C.F.R. §§ 4.24, 4.25 (2021).  Furthermore, interviewed pool participants only received monthly or other periodic false account statements that fraudulently represented that pool participants' investments were profitable, when no such accounts existed.  In any event, it appears that Defendants only provided falsified trading

statements, rather than true and accurate account statements to pool participants—presented and computed in accordance with generally accepted accounting principles.  Therefore, Defendants violated Regulations 4.21(a)(1) and 4.22(a) and (c).

**I.      Defendants Made False Statements to the Commission in Violation of Section 6(c)(2) of the Act, 7 U.S.C. § 9(2).**

Section 6(c)(2) of the Act, 7 U.S.C. § 9(2), provides that it is unlawful "for any person to make any false or misleading statement of a material fact to the Commission . . . or to omit to state in any such statement any material fact that is necessary to make any statement of material fact made not misleading in any material respect, if the person knew, or reasonably should have known, the statement to be false or misleading."  By its plain language, Section 6(c)(2) prohibits false or misleading statements or omissions of material fact to the Commission that the Defendants knew, or reasonably should have known, were false or misleading.  There is no requirement that the statements be made under oath, such as in sworn testimony.  "A statement made to the Division of Enforcement during the course of an investigation, whether under oath, . . . in response to an investigative subpoena, . . . or voluntarily, . . . is a statement 'made to the Commission.'"  *CFTC v. Gramalegui*, No. 15-cv-02313-REB-GPG, 2018 WL 4610953, at *24 (D. Col. Sept. 26, 2019) (citations omitted); *see also In re Beatty*, CFTC No. 14-34, 2014 WL 4965119, at *2 & 6 (Sept. 30, 2014) (consent order) (false statements made in emails to the Division of Enforcement in response to three Commission subpoenas); *In re Stropp*, CFTC No. 14-09, 2014 WL 1117269, at *2 (Mar. 18, 2014) (consent order) (false statements made in a financial disclosure to the Division of Enforcement).

Here, Defendants submitted material information that Defendants knew or should have known was false or misleading.  Specifically, Defendants submitted incomplete lists of clients in response to a Division subpoena.  Defendants, through counsel, represented the list was a

complete list of all current and former clients since 2012.  But the list contained obvious

omissions that Defendants knew or should have known were false.  Defendants omitted

approximately forty pool participants that had provided, collectively, over $2 million to the

Pools.

**J.      DCAST and Five Traders Are Liable for Castilla's Violations Pursuant to 7 U.S.C.
         § 2(a)(1)(B) and 17 C.F.R. § 1.2.**

Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2

(2021), provide that a principal is liable for the acts, omissions, and failures of its agents that are

done within the scope for their employment with the principal.  The Proposed Consent Order

states that, throughout the Relevant Period, Castilla acted within the scope of his employment or

agency with DCAST and Five Traders, including making representations and issuing false

account statements on behalf of each entity.  Therefore, pursuant to Section 2(a)(1)(B) of the Act

and Regulation 1.2, DCAST and Five Traders are liable as principals for Castilla's violations of

Sections 4b(a)(1)(A)-(C), 4k(2), 4*o*(1)(A) and (B), and 6(c)(2) of the Act.

## V.      PERMANENT INJUNCTION

Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), empowers the CFTC to seek permanent

injunctive relief and states in pertinent part:

> Whenever it shall appear to the [CFTC] that any registered entity or
> other person has engaged in, is engaging in, or is about to engage in
> any act or practice constituting a violation of any provision of this
> Act or any rule, regulation or order, thereunder . . . the [CFTC] may
> bring an action in the proper district court of the United States, . . .
> to enjoin such action or practice, or to enforce compliance with this
> Act, or any rule, regulation or order thereunder… .

A court may issue a statutory injunction without considering traditional equitable

factors such as inadequacy of other remedies or irreparable harm.  *See CFTC v. Hunt*, 591 F.2d

1211, 1220 (7th Cir. 1979); *CFTC v. Muller*, 570 F.2d 1296, 1300 (5th Cir. 1978). In granting an

25

injunction, "the ultimate test . . . is whether the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future."  *CFTC v. Wilshire Inv. Mgmt. Corp.*, 531 F.3d 1339, 1346 (11th Cir. 2008) (quoting *SEC v. Caterinicchia*, 613 F.2d 102, 105 (5th Cir. 1980)); *see also SEC v. O'Hagan*, 901 F. Supp. 1461, 1472-73 (D. Minn. 1995).  In evaluating whether to grant an injunction, the Court may consider the following factors:

> [T]he egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations.

*Wilshire Inv. Mgmt.*, 531 F.3d at 1346 (quoting *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1322 (11th Cir. 1982)); *see also SEC v. Cohen*, No. 4:05CV371-DJS, 2007 WL 1192438, at *19 (E.D. Mo. Apr. 19, 2007).  These factors favor granting the requested injunction against the Entity Defendants.

The scope of the injunctive relief can be tailored to meet the circumstances of the violations shown.  Broad injunctions prohibiting trading activity, in addition to enjoining defendants from future violations, are often warranted.  *See*, *e.g.*, *Wilshire Inv. Mgmt.*, 531 F.3d at 1346 (upholding the district court's permanent injunction prohibiting the defendants from "engaging in any commodity-related activity"); *see also CFTC v. Noble Wealth Data Info. Servs.*, 90 F. Supp. 2d 676, 692 (D. Md. 2000) ("The pervasiveness and seriousness of [the defendant's] violation justify the issuance of a permanent injunction prohibiting him from violating the Act and from engaging in any commodity-related activity, including soliciting customers and funds."); *Rosenberg*, 85 F. Supp. 2d at 454-55 (permanently enjoining defendant from trading commodities on behalf of others).  Under these standards, the Entity Defendants should be permanently restrained, enjoined and prohibited from directly or indirectly:

a. Cheating or defrauding, or attempting to cheat or defraud, other persons in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery that is made, or to be made, for or on behalf of, or with, any other person in violation of Section 4b(a)(1)(A) of the Act, 7 U.S.C. §§ 6b(a)(1)(A);

b. Willfully making or causing to be made false statements or reports to another person in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery that is made, or to be made, for or on behalf of, or with, any other person in violation of 7 U.S.C. § 6b(a)(1)(B);

c. Willfully deceiving or attempting to deceive other persons in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery in violation of 7 U.S.C. § 6b(a)(1)(C).

d. Employing any device, scheme, or artifice to defraud any client or participant or prospective client or participant, or engaging in any transaction, practice or course of business which operates as a fraud or deceit upon any client or participant or prospective participant in violation of Section 4*o*(1) of the Act, 7 U.S.C. § 6*o*(1); and

e. Making any false or misleading statement of material fact to the Commission in violation of Section 6(c)(2), 7 U.S.C. § 9(2).

The Entity Defendants should further be permanently restrained, enjoined and prohibited from directly or indirectly:

a. Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40);

b.      Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2021), for their own personal account or for any account in which they have a direct or indirect interest;

c.      Having any commodity interests traded on their behalf;

d.      Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

e.      Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

f.      Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2021); and/or

g.      Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2021)), agent or any other officer or employee of any person (as that term is defined in Section 1a(38) of the Act, 7 U.S.C. § 1a(38)), registered, exempted from registration or required to be registered with the Commission except as provided for in 17 C.F.R. § 4.14(a)(9).

## VI.     RESTITUTION, DISGORGEMENT, AND CIVIL MONETARY PENALTY

### A.     Restitution

Pursuant to Section 6c(d)(3) of the Act, 7 U.S.C. § 13a-1(d)(3), "[T]he Commission may seek, and the court may impose, on a proper showing, on any person found in the action to have committed any violation, equitable remedies including—(A) restitution to persons who have sustained losses proximately caused by such violation (in the amount of such losses)."  *See also CFTC v. Smithers*, No. 9:12-cv-81165-KAM, 2013 WL 4851684, at *10-11 (S.D. Fla. July 31, 2013) (noting the statutory amendment to Section 6c(d) to measure restitution by the "amount of customer losses").

The Entity Defendants should be ordered to pay, jointly and severally, restitution in the amount of two million, six hundred eighty-seven thousand, four hundred forty dollars ($2,687,440) ("Restitution Obligation"), representing losses to persons proximately caused by such violations described above. The Court should order payment of the Restitution Obligation in a manner consistent with the proposed order submitted with this Motion.  As detailed in the proposed order, the Restitution Obligation would also become joint and several with the Restitution Obligation against Castilla in the Consent Order proposed by the Commission and Castilla.

### B.     Disgorgement

Pursuant to Section 6c(d)(3) of the Act, 7 U.S.C. § 13a-1(d)(3), "[T]he Commission may seek, and the court may impose, on a proper showing, on any person found in the action to have committed any violation, equitable remedies including—…(B) disgorgement of gains received in connection with such violation."  "Disgorgement is an equitable remedy intended to prevent unjust enrichment." *CFTC v. Southern Trust Metals, Inc.*, 391 F. Supp.3d 1167, 1171 (S.D. Fla. 2019) (internal quotation omitted).  "To support a disgorgement order, 'the CFTC need only

produce a reasonable approximation of a defendant's ill-gotten gains.'" *Id.* (internal quotation omitted). "Exactitude is not a requirement so long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created the uncertainty." *Id.* (internal quotation omitted).

Here the Entity Defendants should be ordered to pay, jointly and severally, disgorgement in the amount of three million, three hundred fifty thousand dollars ($3,350,000) ("Disgorgement Obligation"), representing the gains received in connection with such violations. The Court should order payment of the Disgorgement Obligation in the manner set forth in the proposed order submitted with this Motion—and would become joint and several with Castilla's Disgorgement Obligation. Additionally, to the extent Defendants DCAST, Five Traders, or Castilla make payments of the Restitution Obligation under the proposed order or under the Consent Order, the proposed order provides dollar-for-dollar credit against the Disgorgement Obligation for any restitution payments.

**C.     Civil Monetary Penalty**

Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1)(A), provides that "the Commission may seek and the court shall have jurisdiction to impose, on a proper showing, on any person found in the action to have committed any violation [of the Act or Regulations] a civil penalty." Pursuant to Section 6c(d)(1)(A) of the Act, the civil monetary penalty shall be not more than triple the monetary gain.

Civil monetary penalties should "reflect the abstract or general seriousness of each violation and should be sufficiently high to deter future violations," which means that civil monetary penalties should make it financially detrimental to a defendant to fail to comply with the Act and Regulations so that the defendant would rather comply than risk violations. *In re Grossfeld*, [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,921 at 44,467-8 (CFTC

Dec. 10, 1996), *aff'd*, 137 F.3d 1300 (11th Cir. 1998).  Severe sanctions are particularly warranted when a defendant repeatedly violates the Act, *In re Slusser*, CFTC Docket No. 94-14, 1999 WL 507574 at *18 (CFTC July 19, 1999) (internal quotations omitted); *see also Reddy v. CFTC*, 191 F.3d 109, 123 (2d Cir. 1999) (providing that civil monetary penalties serve to further the Act's remedial policies and to deter others from committing similar violations).

As discussed above, the repeated intentional violations warrant the imposition of a civil monetary penalty and the Court should order the Entity Defendants to pay, jointly and severally, a civil monetary penalty in the amount of ten million, fifty thousand dollars ($10,050,000) ("CMP Obligation"), which represents three times the gains to Defendants from the violations of the Act and Regulations in accordance with 7 U.S.C. § 13a-1(d)(1)(A)—that is, three times the disgorgement amount.  The Court should order payment of the CMP Obligation in a manner consistent with the proposed order submitted with this Motion.

## VII.   CONCLUSION

The Commission respectfully requests that the Court, as authorized by Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), and pursuant to its own equitable powers, grant the Commission's Motion, enter final judgment against the Entity Defendants, and issue a final order in the form of the proposed Order for Final Judgement by Default, Permanent Injunction, Civil Monetary Penalties, and Other Equitable Relief Against Defendants DCAST Capital and Five Traders.

December 16, 2022                          Respectfully submitted,

                                          PLAINTIFF COMMODITY FUTURES
                                          TRADING COMMISSION


                                          s/Paul M. Flucke
                                          Paul M. Flucke (S.D. Fla. Bar # A5502898)
                                          Nicholas S. Sloey (S.D. Fla. Bar # A5502824)
                                          Commodity Futures Trading Commission
                                          2600 Grand Boulevard, Suite 210
                                          Kansas City, MO 64108
                                          Telephone:     816-960-7728 (Sloey)
                                                         816-960-7700 (Flucke)
                                          Facsimile:     816-960-7751
                                          E-mail:        nsloey@cftc.gov
                                                         pflucke@cftc.gov

**<u>Certificate of Service</u>**

I hereby certify that a true and correct copy of the foregoing was served by mail on all

defendants at their last known address: 8181 Southwest 122nd Ave., Miami, FL, 33183

<u>/s/ Paul M. Flucke</u>
Attorney for Plaintiff